**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SELWYN KARP, Derivatively On Behalf Of NEW YORK COMMUNITY BANCORP, INC., | Case No: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| THOMAS R. CANGEMI, JOHN J. PINTO, ALESSANDRO P. DINELLO, JAMES J. CARPENTER, HANIF DAHYA, LESLIE D. DUNN, MARSHALL LUX, LAWRENCE ROSANO, JR., RONALD A. ROSENFELD, LAWRENCE J. SAVARESE, PETER SCHOELS, DAVID L. TREADWELL, ROBERT WANN, and JENNIFER R. WHIP, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendants, | |
| and, | |
| NEW YORK COMMUNITY BANCORP, INC., | |
| Nominal Defendant. | |

Plaintiff Selwyn Karp ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of New York Community Bancorp, Inc. ("NYCB" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable

opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from March 1, 2023 through January 31, 2024 (the "Relevant Period") and have caused substantial harm to the Company.

2.      Through the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, particularly with respect to the Purchase and Assumption Agreement to acquire certain assets and assume certain liabilities of Signature Bridge Bank, N.A. ("Signature") that the Company entered into on March 20, 2023.

3.      Specifically, the Individual Defendants failed to disclose to investors: (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; (v) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (vi) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

4.      On January 30, 2024, the truth emerged when NYCB announced its fiscal fourth quarter 2023 financial results. The Company reported a fourth quarter net loss of $252 million due to "a $552 million provision for loan losses," which was "primarily attributable to higher net

2

charge-offs" and "a significant increase in the ACL [allowance for credit losses]" coverage ratio. Additionally, the Company disclosed that it would cut its quarterly dividend to $0.05 per common share. The Company further explained that these actions were "necessary enhancements" after NYCB "crossed th[e] important threshold [of becoming a $100 billion bank] sooner than anticipated as a result of the Signature transaction." Crossing this $100 billion threshold subjected NYCB to enhanced banking standards and requirements.

5.      On this news, NYCB's stock price fell $3.90, or 37.57%, to close at $6.47 per share on January 31, 2024, on unusually heavy trading volume, causing damage to the Company.

## JURISDICTION

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Sections 10(b), and 21D of the Securities Exchange Act of 1934 ("Exchange Act").  This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

7.      This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary

duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

9.      In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

10.      **Plaintiff Selwyn Karp** ("Plaintiff") is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

11.      **Nominal Defendant New York Community Bancorp** ("NYCB") is incorporated under the laws of Delaware with its principal executive offices located in Hicksville, New York. NYCB's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NYCB."

### Director Defendants

12.      **Defendant Alessandro DiNello** ("DiNello") has served as a Company director and Executive Chairman of the Board of Directors (the "Board") since 2022.  Defenant DiNello is also a member of the Executive, Board Credit, and Technology Committees.

13.     **Defendant James J. Carpenter** ("Carpenter") has served as a Company director since 2022.  Defendant Carpenter is also the Chair of the Board Credit Committee and a member of the Risk Assessment Committee.

14.     **Defendant Hanif "Wally" Dahya** ("Dahya") has served as a Company director since 2007. Defendant Dahya is also the Chair of the Nominating and Corporate Governance Committee ("N&G Committee") and a member of the Audit, Compensation, Executive, Board Credit, and Technology Committees.  Defendant Dahya is also the independent presiding Director of the Board.

15.     **Defendant Leslie D. Dunn** ("Dunn") has served as a Company director since 2015. Defendant Dunn is also the Chair of the Compensation Committee and a member of the Audit Committee and N&G Committee.  Defendant Dunn previously served as Chair of the N&G Committee and as a member of the Risk Assessment Committee.

16.     **Defendant Marshall Lux** ("Lux") has served as a Company director since 2022. Defendant Lux is also the Chair of the Technology Committee and is a member of the Audit Committee and Risk Assessment Committee.

17.     **Defendant Lawrence Rosano, Jr.** ("Rosano") has served as a Company director since 2014. Defendant Rosano is also a member of the Compensation Committee, Board Credit Committee and Risk Assessment Committee.

18.     **Defendant Ronald A. Rosenfeld** ("Rosenfeld") has served as a Company director since 2012.  Defendant Rosenfeld is also a member of the N&G Committee, Risk Assessment Committee and Board Credit Committee.

19.      **_Defendant Lawrence J. Savarese_** ("Savarese") has served as a Company director since 2013. Defendant Savarese is also the Chair of the Audit Committee and a member o the Compensation Committee and N&G Committee.

20.      **_Defendant Peter Schoels_** ("Schoels") has served as a Company director since 2013. Defendant Schoels is also a member of the N&G Committee and Technology Committee.

21.      **_Defendant David L. Treadwell_** ("Treadwell") has served as a Company director since 2009. Defendant Treadwell is also the Chair of the Risk Assessment Committee and a member of the Audit Committee and the N&G Committee.

22.      **_Defendant Robert Wann_** ("Wann") has served as a Company director since 2008. Defendant Wann is also a member of the Risk Assessment Committee and Technology Committee.

23.      **_Defendant Jennifer R. Whip_** ("Whip") has served as a Company director since 2017. Defendant Whip is also a member of the Audit Committee, Compensation Committee, Risk Assessment Committee and Board Credit Committee.

24.      The above-named defendants at ¶¶ 12–23 are collectively referred to herein as the "Director Defendants."

**<u>Officer Defendants</u>**

25.      **_Defendant Thomas R. Cangemi_** ("Cangemi") has served as the President, Chief Executive Officer ("CEO"), and director of the Company since 2020, having previously held other senior roles within the Company since 2001. Because of the wrongdoing as alleged herein, Defendant Cangemi is also named as a defendant in the Securities Class Action.[1]

---

[1]      As noted *infra*, with respect to demand futility only, the term "Director Defendants" shall also refer to Defendant Cangemi.

26.     ***Defendant John J. Pinto*** ("Pinto") has served as the Company's Chief Financial Officer ("CFO") since 2020 and was also appointed Senior Executive Vice President in 2021, having previously held other senior roles within the Company since 2001. Because of the wrongdoing as alleged herein, Defendant Cangemi is also named as a defendant in the Securities Class Action.

27.     The above-named defendants at ¶¶ 25–26 are collectively referred to herein as the "Officer Defendants."

28.     The Director Defendants and the Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29.     NYCB is a large commercial-real estate lender in the New York City market area, where it specializes in rent-regulated, non-luxury apartment buildings. NYCB is engaged in several national businesses, including multi-family lending, mortgage originations and servicing, and warehouse lending. The Company's specialty finance loans and leases are generally made to large corporate obligors that participate in stable industries nationwide, and its warehouse loans are made to mortgage lenders across the country.

30.     On December 1, 2022, the Company completed the acquisition of Flagstar Bancorp, Inc., which became a wholly owned subsidiary called Flagstar Bank, N.A. ("Flagstar").

## FALSE AND MISLEADING STATEMENTS

31.     On March 1, 2023, the Company submitted its Annual Report for the fiscal year ended December 31, 2022 on a Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was

signed by each of the Individual Defendants. The 2022 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Cangemi and Pinto.

32.     The 2022 10-K stated, in relevant part:

**Asset Quality**

Asset quality remained strong during 2022 as increases in NPAs were substantially due to changes in asset mix related to the Flagstar acquisition and centered on non-performing one-to-four family residential and home equity loans. Total NPAs at December 31, 2022 were $153 million compared to $41 million at December 31, 2021, primarily driven by NPLs and assets acquired in the Flagstar acquisition. At December 31, 2022, NPAs to total assets equaled 0.17 percent and NPLs to total loans were 0.20 percent, compared to 0.07 percent for both metrics at December 31, 2021.

\*\*\*

At December 31, 2022, total assets were $90.1 billion, up $30.6 billion or 51 percent compared to December 31, 2021. The growth compared the prior period was primarily due to the Flagstar acquisition which added $25.8 billion of assets, net of PAA, while the remaining growth was driven by growth in our lending portfolios.

\*\*\*

<u>**Provision for Credit Losses**</u>

For the twelve months ended December 31, 2022, the provision for credit losses totaled $133 million compared to $3 million for the twelve months ended December 31, 2021. The fourth-quarter and full-year provision for credit losses was impacted by the provision for credit losses related to the initial ACL measurement of non-PCD Flagstar acquired loans totaling $117 million.

33.     The 2022 10-K further stated that the Company's "allowance for credit losses might not be sufficient to cover our actual losses." Specifically, the Company stated, in relevant part:

***Our allowance for credit losses might not be sufficient to cover our actual losses, which would adversely impact our financial condition and results of operations.***

In addition to mitigating credit risk through our underwriting processes, we attempt to mitigate such risk through the establishment of an allowance for credit losses. The process of determining whether or not the allowance is sufficient to cover potential credit losses is based on the current expected credit loss model or CECL.

8

This methodology is described in detail under "Critical Accounting Estimates" in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report. CECL may result in greater volatility in the level of the ACL, depending on various assumptions and factors used in this model. If the judgments and assumptions we make with regard to the allowance are incorrect, our allowance for losses on such loans might not be sufficient, and an additional provision for credit losses might need to be made. Depending on the amount of such loan loss provisions, the adverse impact on our earnings could be material. In addition, growth in our loan portfolio may require us to increase the allowance for credit losses on such loans by making additional provisions, which would reduce our net income. Furthermore, bank regulators have the authority to require us to make provisions for credit losses or otherwise recognize loan charge-offs following their periodic review of our loan portfolio, our underwriting procedures, and our allowance for losses on such loans. Any increase in the loan loss allowance or in loan charge-offs as required by such regulatory authorities could have a material adverse effect on our financial condition and results of operations.

***

Partially reflecting the net recoveries noted above, and the provision of $133 million for the allowance for loan losses, the allowance for credit losses increased $194 million, equaling $393 million at December 31, 2022 from $199 million at December 31, 2021. The majority of the increase is related to the initial provision for credit losses of $117 million and the adjustment for PCD loans acquired in the Flagstar acquisition. The allowance for credit losses on loans and leases represented 278.87 percent of non-performing loans at December 31, 2022, as compared to 611.79 percent at the prior year-end.

Based upon all relevant and available information at the end of this December, management believes that the allowance for losses on loans was appropriate at that date.

34.    On March 20, 2023, the Company announced that its subsidiary, Flagstar Bank, N.A., acquired certain assets and assumed certain liabilities of Signature Bridge Bank in a press release that stated, in relevant part:

The Bank acquired only certain financially and strategically complementary parts of Signature that are intended to enhance our future growth. Under terms of the Purchase and Assumption Agreement (the "Agreement") with the FDIC, the Bank:

- Purchased assets of approximately $38 billion, including cash totaling approximately $25 billion and approximately $13 billion in loans. Included

in the $25 billion of cash is $2.7 billion arising from a discounted bid to net asset value.

• Assumed liabilities approximating $36 billion, including deposits of approximately $34 billion and other liabilities of approximately $2 billion.

• The Company is working on an agreement to sub-service the legacy Signature multi-family, commercial real estate ("CRE"), and other loans it did not acquire.

• Also included in the transaction is Signature's wealth-management and broker-dealer business.

\*\*\*

Mr. Cangemi continued, "This transaction continues our transformation from a predominantly multi-family lender to a diversified full-service commercial bank. It builds upon and accelerates the transformation set in motion by the merger of New York Community and Flagstar, and we believe the financial metrics are extremely attractive. The deal is expected to significantly strengthen our deposit base, lower the loan-to-deposit ratio, provide the opportunity to pay down a substantial amount of our wholesale funding, and further diversify our loan portfolio away from CRE loans and more toward commercial loans. Financially, the deal is expected to be significantly accretive to both earnings per share and to tangible book value per share. The net interest margin expands due to lower funding costs, the additional deposits reduce the loan-to-deposit ratio to less than 90%, improves our profitability ratios, adds liquidity, and we maintain strong pro-forma capital ratios."

Further, he added, "Both the Company and the Bank were well positioned prior to the recent market turmoil, with strong capital, a stable retail deposit franchise, and ample liquidity. Moreover, our asset quality metrics remain solid, as they have over multiple business cycles. After this transaction, we will be even better positioned to deal with any residual market issues, including by now operating with a significantly lower loan-to-deposit ratio. Overall, we are happy that our conservative business model and balance sheet put us in a position to quickly consummate this important transaction."

35.    On April 28, 2023, the Company announced its first quarter 2023 financial results

in a press release with stated in relevant part:

At March 31, 2023 total assets were $123.8 billion compared to $90.1 billion at December 31, 2022 and $61.0 billion at March 31, 2022.

\*\*\*

Asset Quality:

    – Our asset quality metrics and trends remain strong.

    – Non-performing assets ("NPAs") were $161 million at March 31, 2023 or 0.13% of total assets.

    – Non-performing loans ("NPLs") were $148 million at March 31, 2023 or 0.18% of total loans.

    – The allowance for credit losses totaled $550 million at March 31, 2023 or 370.38% of non-performing loans and 0.67% of total loans.

    – Net charge-offs were zero during first quarter 2023 compared to $2 million during first quarter 2022 and $1 million during fourth quarter 2022.

\*\*\*

In addition to the bargain purchase gain, first quarter 2023 GAAP results were impacted by the following items:

    • Merger-related and restructuring expenses of $67 million, comprised of $40 million for the Flagstar acquisition and $27 million for the Signature transaction;

    • An initial provision for credit losses totaling $132 million for the loans acquired from Signature; and

    • A 48% increase in average diluted common shares outstanding compared to the year-ago first quarter.

\*\*\*

"While we have closed two acquisitions over the past four months, we have remained focused on our fundamentals including asset quality. Our asset quality metrics remain strong with total non-performing assets increasing only slightly compared to year-end and net charge-offs remaining at near zero. We continue to be laser focused on credit quality across all lending verticals […]."

36.    On May 10, 2023, the Company submitted its quarterly report for the period ended March 31, 2023 on a Form 10-Q filed with the SEC, which was signed by and contained SOX certifications by the Officer Defendants ("1Q23 10-Q"). The 1Q23 10-Q affirmed the previously reported financial results and stated:

Historically, our level of net charge-offs has been relatively low in downward credit cycles, even when the volume of non-performing loans has increased. For the three months ended March 31, 2023, our net charge-offs were zero as compared to net charge-offs of $2 million over the same period in 2022.

The allowance for credit losses increased $157 million, equaling $550 million at March 31, 2023 from $393 million at December 31, 2022. The majority of the increase was related to the initial provision for credit losses of $132 million for the acquired loans in the Signature Transaction and an $18 million provision for loan losses primarily related to higher loan volume. The allowance for credit losses on loans and leases represented 341 percent of non-performing loans at March 31, 2023, as compared to 279 percent at the prior year-end.

Based upon all relevant and available information at March 31, 2023, management believes that the allowance for losses on loans was appropriate at that date.

37.     On July 27, 2023, the Company announced its second quarter 2023 financial results

in a press release which stated in relevant part:

At June 30, 2023 total assets were $118.8 billion compared to $123.7 billion at March 31, 2023 and $90.1 billion at December 31, 2022.

***

Asset Quality:

– Non-performing assets ("NPAs") were $246 million at June 30, 2023 or 0.21% of total assets.

– Non-performing loans ("NPLs") were $233 million at June 30, 2023 or 0.28% of total loans.

 – The allowance for credit losses totaled $594 million at June 30, 2023 or 255.40% of non-performing loans and 0.71% of total loans.

– Net recoveries were $1 million during second quarter 2023 compared to $7 million of net recoveries during second quarter 2022 and zero in the previous quarter.

***

Our asset quality trends remain among the best in the industry, despite the slightly higher NPLs. At June 30, 2023, NPAs to total assets equaled 21 basis points compared to 14 basis points at March 31, 2023, while NPLs to total loans equaled 28 basis points compared to 20 basis points at March 31, 2023.

12

Allowance for Credit Losses

At June 30, 2023, the allowance for credit losses was $594 million compared to $550 million at March 31, 2023, up $44 million. The allowance for credit losses to total loans held for investment increased to 71 basis points at June 30, 2023 compared to 67 basis points at March 31, 2023.

38.     On August 9, 2023, the Company submitted its quarterly report for the period ended June 30, 2023, on a Form 10-Q filed with the SEC, which was signed by and contained SOX certifications by the Officer Defendants ("2Q23 10-Q"). The 2Q23 10-Q affirmed the previously reported financial results and stated:

At June 30, 2023, total assets were $118.8 billion, up $28.7 billion compared to December 31, 2022. Total deposits were $88.5 billion at June 30, 2023, up $29.8 billion from December 31, 2022. These year-to-date increases were primarily due to our March 20, 2023, assumption of a substantial amount of the deposits and certain identified liabilities and the acquisition of certain assets and lines of business of Signature Bridge Bank, from the FDIC, as receiver for Signature Bridge Bank (the "Signature Transaction").

***

The allowance for credit losses on loans and leases increased $201 million, equaling $594 million at June 30, 2023 from $393 million at December 31, 2022. The increase was primarily related to the initial allowance for credit losses of $132 million for the acquired loans in the Signature Transaction, an increase of $13 million in specific reserves primarily related to two loans that have moved to non-accrual and an increase of $56 million primarily related to our worsening forecast of macroeconomic conditions and origination volume since year-end. The allowance for credit losses on loans and leases represented 255 percent of nonperforming loans at June 30, 2023, as compared to 279 percent at the prior yearend.

Based upon all relevant and available information at June 30, 2023, management believes that the allowance for credit losses on loans and leases represents a reasonable estimate based upon our judgment as that date.

39.     On October 26, 2023, the Company announced its third quarter 2023 financial results in a press release which stated in relevant part:

Balance Sheet:

13

–    Total assets of $111.2 billion at September 30, 2023 declined $7.6 billion compared to June 30, 2023, primarily due to a decline in cash balances, a portion of which was used to pay-down wholesale borrowings and brokered deposits.  This was partially offset by growth in the loan portfolio.

\*\*\*

Asset Quality:

–    Non-performing assets ("NPAs") were $404 million at September 30, 2023 or 0.36% of total assets.

–    Non-performing loans ("NPLs") were $392 million at September 30, 2023 or 0.47% of total loans.

–    The allowance for credit losses totaled $619 million at September 30, 2023 or 158% of non-performing loans and 0.74% of total loans.

–    Net charge offs were $24 million during third quarter 2023 compared to zero during third quarter 2022 and net recoveries of $1 million in the previous quarter.

\*\*\*

"On the asset quality front, while we experienced a significant decline in early-stage delinquencies compared to the previous quarter, non-performing loans increased on a linked-quarter basis, owing primarily to two commercial real estate loans in the office sector.  Despite this, our asset quality metrics continue to be among the best in the industry with non-performing loans at 47 basis points of total loans and net charge-offs of only three basis points.  This reflects our conservative underwriting practices.

\*\*\*

Allowance for Credit Losses

At September 30, 2023, the allowance for credit losses was $619 million compared to $594 million at June 30, 2023, up $25 million.  The allowance for credit losses to total loans held for investment increased to 74 basis points at September 30, 2023 compared to 71 basis points at June 30, 2023.

\*\*\*

Provision for Credit Losses

14

For the three months ended September 30, 2023, the provision for credit losses totaled $62 million compared to a $49 million provision for the three months ended June 30, 2023.

For the nine months ended September 30, 2023, the provision for credit losses totaled $281 million compared to $9 million for the nine months ended September 30, 2022.  The year-to-date amount includes a $132 million initial provision for credit losses for the acquired portion of the Signature loan portfolio.

40.     On November 9, 2023, the Company submitted its quarterly report for the period ended September 30, 2023, on a Form 10-Q filed with the SEC, which was signed by and contained SOX certifications by the Officer Defendants ("3Q23 10-Q"). The 3Q23 10-Q affirmed the previously reported financial results and stated:

**Provision for Credit Losses**

*Comparison to Prior Quarter*

The three months ended September 30, 2023 the provision for credit losses totaled $62 million compared to a $49 million provision for the three months ended June 30, 2023.  During the third quarter 2023, we incorporated the commercial loans and unfunded commitments acquired in the Signature Transaction in the Company's allowance for credit loss models which resulted in a net provision benefit of $13 million. The $75 million provision on the remainder of the portfolio was driven by increases to our estimated loan loss and unfunded commitment reserves as a result of changes in the macroeconomic environment, specifically the inflationary pressures leading to sharp increases in interest rates and a slow-down of prepayment activity leading to longer weighted average lives on the balance sheet. In addition, the increase reflects unfavorable market conditions in the CRE portfolio (primarily office). During the quarter we had net charge-offs totaling $24 million.

The second quarter 2023 provision of $49 million included increases of $13 million related to specific reserves for new non-accrual loans and the remainder was driven by changes in the macroeconomic forecast.

                                    ***

We continue to monitor our loans held for investment portfolio and the related allowance for credit losses, particularly given the economic pressures facing the commercial real estate and multi-family markets. While our multi-family lending niche has not been immune to downturns in the credit cycle, the limited number of losses we have recorded, even in adverse credit cycles, suggests that the multi-

family loans we produce involve less credit risk than certain other types of loans. In general, buildings that are subject to rent regulation have historically tended to be stable, with occupancy levels remaining more or less constant over time. Because the rents are typically below market and the buildings securing our loans are generally maintained in good condition, they have been more likely to retain their tenants in adverse economic times. In addition, we generally exclude any short-term property tax exemptions and abatement benefits the property owners receive when we underwrite our multi-family loans.

***

The allowance for credit losses increased $157 million, equaling $550 million at March 31, 2023 from $393 million at December 31, 2022. The majority of the increase was related to the initial provision for credit losses of $132 million for the acquired loans in the Signature Transaction and an $18 million provision for loan losses primarily related to higher loan volume. The allowance for credit losses on loans and leases represented 341 percent of non-performing loans at March 31, 2023, as compared to 279 percent at the prior year-end.

41.     The above-referenced statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors: (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; (v) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (vi) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

42.     On January 31, 2024, before the market opened, NYCB announced its fiscal fourth quarter 2023 financial results. The Company reported a fourth quarter net loss of $252 million due

to "a $552 million provision for loan losses," which was "primarily attributable to higher net charge-offs" and "a significant increase in the ACL [allowance for credit losses]" coverage ratio.

43.     Additionally, the Company disclosed that it would cut its quarterly dividend to $0.05 per common share. The Company further explained that these actions were "necessary enhancements" after NYCB "crossed th[e] important threshold [of becoming a $100 billion bank] sooner than anticipated as a result of the Signature transaction." Crossing this $100 billion threshold subjected NYCB to enhanced banking standards and requirements.  Specifically, in its press release, the Company stated the following, in relevant part:

> For the three months ended December 31, 2023, the Company reported a net loss of $252 million compared to net income of $207 million for the three months ended September 30, 2023. For the three months ended December 31, 2023, the Company reported a net loss available to common stockholders of $260 million compared to net income available to common stockholders of $199 million for the three months ended September 30, 2023. Diluted EPS totaled $(0.36) for the three months ended December 31, 2023 compared to diluted EPS of $0.27 for the three months ended September 30, 2023.

> Fourth quarter 2023 net income and diluted EPS were impacted by merger-related items and a FDIC special assessment. As adjusted, the net loss for the three months ended December 31, 2023 totaled $185 million, compared to net income of $274 million for the three months ended September 30, 2023.  The net loss includes the impact from higher provision for credit losses that primarily reflects a significant increase in the ACL which strengthened the credit profile of the Company.

> ***

> "Shortly after closing the acquisition of Flagstar Bank, we were presented with the unique opportunity to accelerate this transformation when we were selected by the FDIC to purchase certain strategically and financially attractive assets and liabilities of Signature Bank. The benefits of this transaction were abundantly clear, as it strengthened our balance sheet by adding a significant amount of low-cost deposits and a middle-market business supported by over 130 private banking teams. The transaction also put us over $100 billion in total assets, placing us firmly in the Category IV large bank class of banks between $100 billion and $250 billion in assets and subjecting us to enhanced prudential standards, including risk-based and leverage capital requirements, liquidity standards, requirements for overall risk management and stress testing.  While we began preparing to be a $100 billion bank almost immediately after closing the Flagstar acquisition, we crossed this important

threshold sooner than anticipated as a result of the Signature transaction. Alongside the integration of our three banks and in anticipation of our initial capital plan submission in April of this year, we have pivoted quickly and accelerated some necessary enhancements that come with being a $100 billion-plus Category IV bank.

"With this in mind, during the fourth quarter, we took decisive actions to build capital, reinforce our balance sheet, strengthen our risk management processes, and better align ourselves with the relevant bank peers. We significantly built our reserve levels by recording a $552 million provision for loan losses, bringing our ACL coverage more in line with these peer banks.  In addition, we added on-balance sheet liquidity as we prepare for the enhanced prudential standards that apply to banks with $100 billion or more in total assets.

"To this end, we are also building capital by reducing our quarterly common dividend to $0.05 per common share. We recognize the importance and impact of the dividend reduction on all of our stockholders and it was not made lightly.  We believe this is the prudent decision as it will allow us to accelerate the building of capital to support our balance sheet as a Category IV bank.

44.     The Company disclosed further details concerning its allowance for credit losses,

stating in relevant part:

At December 31, 2023, the allowance for credit losses was $992 million compared to $619 million at September 30, 2023, up $373 million reflecting our actions to build reserves during the quarter to address weakness in the office sector, potential repricing risk in the multi-family portfolio and an increase in classified assets, which better aligns the Company with its relevant bank peers, including Category IV banks.

45.     The Company also disclosed details concerning the Company's provision for credit

losses, stating in relevant part:

For the three months ended December 31, 2023, the provision for credit losses totaled $552 million compared to a $62 million provision for the three months ended September 30, 2023.  The increase is primarily attributable to higher net charge-offs, as well as, to address weakness in the office sector, potential repricing risk in the multi-family portfolio, and an increase in classified assets.

***

Fourth quarter net charge-offs were primarily related to two loans. First, we had one co-op loan with a unique feature that pre-funded capital expenditures. Although the borrower was not in default, the loan was transferred to held for sale

18

during the fourth quarter.  We expect the loan to be sold during the first quarter of 2024.  We also performed a review of other co-op loans and did not find any other loans with similar characteristics.

Second, we had an additional charge-off on an office loan that went non-accrual during the third quarter, based on an updated valuation.  Given the impact of recent credit deterioration within the office portfolio, we determined it prudent to increase the ACL coverage ratio.

Together, these two loans accounted for the bulk of the $185 million of net charge-offs we took during the fourth quarter.

46.     On this news, NYCB's stock price fell $3.90, or 37.57%, to close at $6.47 per share on January 31, 2024, on unusually heavy trading volume.

## DAMAGES TO THE COMPANY

**Securities Class Action**

47.     On February 6, 2024, a securities class action complaint was filed in the United States District Court for the Eastern District of New York against the Company and the Officer Defendants.  The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Lemm v. New York Community Bancorp, Inc., et al.*, Case 1:24-cv-00903 (E.D.N.Y.) ("Securities Class Action").

48.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

49.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

50.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

51.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

52.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

53.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

54.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

55.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

56.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

57.     At all relevant times, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") "which specifically applies to Directors, and the CEO, the CFO, together with all other senior financial officers of the Company designated by the CEO."

58.     In a section entitled "Director and Senior Financial Officer Responsibilities," the Code of Conduct states, in relevant part:

Directors and Senior Financial Officers shall:

[] engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

[] produce full, fair, accurate, timely, and understandable disclosures in the reports that the Company periodically files with, or submits to, the United States Securities

21

and Exchange Commission and in other public communications made by the Company;

[] comply with all applicable governmental laws, rules, and regulations, as well as the rules adopted by any exchange upon which Company-issued securities are listed;

[] promptly bring to the attention of the Corporate Compliance Officer any information he or she may have concerning significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, or any fraud, whether or not material, that involves management or other employees who have a significant role in financial reporting, disclosures, or internal controls; and

[] promptly bring to the attention of the Corporate Compliance Officer any information he or she may have concerning evidence of a material violation of the securities or other laws, rules, or regulations applicable to the Company and to the operation of its business, or a material violation of this Code, by the Company or any agent thereof.

59.    In a section entitled "Enforcement," the Code of Conduct provides that:

Violations of this Code by Directors or Senior Financial Officers are matters of the utmost concern. A Senior Financial Officer who compromises or violates the law or policies and procedures contained in this Code may be subject to disciplinary actions, up to and including termination of employment for cause. A Director who compromises or violates the law or policies and procedures contained in this Code may be subject to disciplinary action upon the review and determination of the Board, up to and including removal from the Board. Directors and Senior Financial Officers may also be subject to civil and/or criminal prosecution.

**Code of Professional Conduct**

60.    Further, the Company also had in place its "Code of Professional Conduct to establish and promote the highest standards of integrity, accountability, and ethics in the conduct of business among Company personnel and with the Company's customers, its vendors, and the banking industry."

61.    The Code of Professional Conduct provides, in relevant part, that "each member of the Board of Directors2 (each, a "Director") and each Employee of the Company (together with

the Directors, collectively, "Company Personnel") shall abide by this Code and the following principles of professional conduct – to wit, each shall:

[] Faithfully advance the legitimate business interests of the Company while fully complying with all applicable laws, regulations, and Company policies […];

[] Avoid apparent and actual conflicts of interest, as well as breaches of fiduciary duties […];

[] Cooperate with the Company's auditors, examiners, regulators, other authorized governmental agencies (e.g., IRS, GSEs) and attorneys, and be completely candid with them.

62.    In a section entitled "Obligation to Report to Company Officials," the Code of Professional Conduct states:

Company Personnel that witness any act(s) and/or omission(s) by other Company Personnel that such witnessing Company Personnel reasonably believes to be in violation of this Code (each such act or omission ultimately determined to be in violation of this Code, a "Code violation") shall be responsible for reporting such act(s) and/or omission(s) to the GC, Human Resources, a departmental manager, or the Flagstar Ethics Hotline (for information about how to submit a confidential report via the Flagstar Ethics Hotline, please see section III.B, below)

63.    In a section entitled "Compliance with Laws, Rules, and Regulations," the Code of Professional Conduct provides, in relevant part:

Obeying the law, both in letter and in spirit, is one of the foundations on which the Company's policies, including this Code, are built. All Company Personnel must respect and obey all applicable laws, rules, and regulations (including, without limitation, insider trading laws). Although not all Company Personnel are expected to know the details of such laws, rules, and regulations, it is important to know enough to determine when to seek advice from supervisors, managers, or other appropriate personal, such as an officer within Human Resources or Legal.

**Audit Committee Charter**

64.    At all relevant times, the Company had in place its Audit Committee Charter which sets forth the specific duties and responsibilities of the Audit Committee – comprised of Defendants Dahya, Dunn, Lux, Savarese, and Whip. The Audit Committee Charter provides that

the purpose of the Audit Committee is to "assist the Boards in fulfilling their respective oversight responsibilities, including with respect to review and, as applicable, approval of (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; (3) the qualifications, performance and independence of the Company's Independent Registered Public Accounting Firm (the "Independent Auditor"); (4) the performance of the Company's internal audit function (the "Internal Audit Function"); (5) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time; and (6) to provide the annual report of the Committee to be included in the Company's annual proxy statement."

65.    The Audit Committee Charter further sets forth these additional duties and responsibilities:

[] Oversee the preparation of an annual report by the Audit Committee which must be included in the Holding Company's annual proxy statement.

[] Meet with management of the Company and the Independent Auditor to review and discuss the Holding Company's annual audited financial statements and quarterly financial statements and such other related financial statements of the Bank or any of the Company's affiliates as the Committees in its discretion shall deem necessary or appropriate;

[] With regard to the Company's financial statements and disclosures, review: (A) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) analyses prepared by management and/or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company;

[] Discuss the Company's policies with respect to risk assessment and risk management to ensure that the CEO and senior management of the Company assess and manage the Company's exposure to risk;

[] Discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures;

[] Perform, or engage others to undertake such discussion, meetings, actions, monitoring, investigations, or other procedures as the Committees deem necessary or appropriate.

**Risk Committee Charter**

66.     At all relevant times, the Company had in place its Risk Assessment Committee Charter which sets forth the specific duties and responsibilities of the Risk Assessment Committee – comprised of Defendants Carpenter, Lux, Rosano, Rosenfeld, Treadwell, Wann, and Whip. The Risk Assessment Committee Charter states that its purpose "is to assist the Board in fulfilling its responsibilities with respect to oversight of the Corporation's risk management and compliance frameworks, including as it relates to (1) the risk appetite of the Corporation; (2) the enterprise compliance program; (3) regulatory compliance and supervisory expectations; and (4) the policies and procedures used to identify, measure, monitor and manage various risks, including the Corporation's strategic, credit and investment, market, operational, compliance, liquidity and reputational risks."

67.     The Risk Assessment Committee Charter sets forth these additional duties and responsibilities, in relevant part:

[] Review and approve the Corporation's risk framework, risk appetite and policies, including:

[] Reviewing the Corporation's actual risk profile against the Board approved risk appetite which includes information on the categories of risk the Corporation faces (e.g., credit, liquidity, interest rate, price, strategic, compliance, operational, and reputation risk); review exceptions, if any, to risk limits and key risk indicators ("KRIs") that can serve as signals of changing risk; and review management proposed updates and/or revisions to Board-level KRIs and recommend appropriate action to the Board for its consideration and approval.

25

[] Reviewing and evaluating proposed updates to the Corporation's Risk Appetite Policy and supporting documentation in order to make recommendations to the Board that considers how much risk the Corporation or applicable NYCB Entity is prepared to take in order to pursue its Strategic Plan objectives, what kinds of risks are most relevant on an enterprise-wide basis, and how it should define its risk appetite tolerances.

[] Review and evaluate supporting information, documentation and rationale for any Risk Profiles that are not aligned with their corresponding Risk Appetites, along with monitoring timelines for bringing them into alignment. The Committee shall be promptly notified if any Risk Profiles exceed their corresponding Risk Appetite.

[] Oversee risk concentrations across the Corporation including, without limitation, commercial real estate and liquidity, and review of reports that indicate whether concentrations are within the accepted tolerances as described within the Risk Appetite Policy.

[] Oversee senior management's responsibilities related to oversight of the Corporation's credit portfolio, including management's responses to trends in credit risk, credit concentration and asset quality, and review and assess on a quarterly basis management's process for establishing the Corporation's allowance for credit losses.

[] Consult with other committees of the Board on risk-related matters, in such manner as the Committee or its chair deems appropriate. The chairperson of the Committee shall discuss with the chairperson of the Audit Committee the Committee's review of the Corporation's allowance for credit losses on a quarterly basis.

[] Oversee the Corporation's Enterprise Risk Management ("ERM") Framework and Enterprise Compliance Risk Management Framework, including overseeing the CRO and ECCO's design and implementation of the ERM framework.

[] Carry out other duties or responsibilities expressly delegated to the Committee by the Board from time to time.

## DUTIES OF THE DIRECTOR DEFENDANTS

68.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

69.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

70.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

71.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

72.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

    (a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and

disseminating truthful and accurate statements to the SEC and investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

73.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Director

Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

74.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

75.     Plaintiffs brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

76.     Plaintiff is a current owner of the Company's stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

77.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

78.     Because of the facts set forth herein, Plaintiffs has not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and

useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

79.     At the time this suit was filed, the Board was comprised of thirteen (13) members – the Director Defendants, as defined at ¶ 24, *supra*, along with Defendant Cangemi (collectively in this section, the "Director Defendants"). Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.,* seven (7), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

80.     According to the Company's 2023 Proxy Statement, "[t]he Board has determined that 10 of our 14 directors are "independent" within the meaning of the rules of the New York Stock Exchange." The Board determined that Defendants Cangemi, DiNello, Carpenter, and Wann are not independent and, thus, demand is futile as to each of them.

81.     Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

82.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

83.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this

complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

84. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

85. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

86. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### Defendant Cangemi

87. Defendant Cangemi neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its President and CEO) is an employee of the Company who derives substantially all of his income from his employment with NYCB, making him not independent, as admitted by the Company in its 2023 Proxy Statement. As such, Defendant Cangemi cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

88.     As CEO, Defendant Cangemi also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Cangemi could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Cangemi is therefore futile.

89.     In addition, Defendant Cangemi receives lucrative compensation in connection with his employment with the Company. Defendant Cangemi is not independent from Defendants Dahya, Dunn, Rosano, Savarese, and Whip as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Cangemi. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Cangemi could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

90.     Defendant Cangemi has served as a Company director throughout the Relevant Period. As a director, Defendant Cangemi was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Cangemi failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

32

91.     Defendant Cangemi, during the Relevant Period, as a trusted senior officer of the Company, conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

92.     Because of Defendant Cangemi's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Cangemi is unable to comply with his fiduciary duties and prosecute this action.  Defendant Cangemi is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

93.     In addition, Defendant Cangemi signed and thus personally made the false and misleading statements in the 2022 10-K, 1Q23 10-Q, 2Q23 10-Q, and 3Q23 10-Q and faces a substantial likelihood of liability therefor.

94.     Defendant Cangemi is neither independent nor disinterested. Any demand upon Defendant Cangemi is futile and, thus, excused.

**Defendant DiNello**

95.     According to the Company's 2023 Proxy Statement, Defendant DiNello is not an independent director. As such, demand is futile as to him for that reason and for the reasons that follow.

96.     Defendant DiNello has served as a Company director at all relevant times hereto. As a director, Defendant DiNello was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time;

33

(iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant DiNello failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

97.     As a trusted Company director, and Chairman of the Board, Defendant DiNello conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

98.     Additionally, in connection with his role as a Company director, Defendant DiNello receives substantial income. Accordingly, Defendant DiNello cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

99.     In addition, Defendant DiNello signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

100.     Defendant DiNello is neither independent nor disinterested. Any demand upon Defendant DiNello is futile and, thus, excused.

**Defendant Carpenter**

101.     According to the Company's 2023 Proxy Statement, Defendant Carpenter is not an independent director. As such, demand is futile as to him for that reason and for the reasons that follow.

102.     Defendant Carpenter has served as a Company director at all relevant times hereto. As a director, Defendant Carpenter was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and

34

accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Carpenter failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

103.    As a trusted Company director, Defendant Carpenter conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

104.    Additionally, in connection with his role as a Company director, Defendant Carpenter receives substantial income. Accordingly, Defendant Carpenter cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

105.    In addition, Defendant Carpenter signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

106.    Defendant Carpenter is neither independent nor disinterested. Any demand upon Defendant Carpenter is futile and, thus, excused.

**Defendant Dahya**

107.    Defendant Dahya has served as a Company director at all relevant times hereto. As a director, Defendant Dahya was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time;

(iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Dahya failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

108. As a trusted Company director, Defendant Dahya conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

109. Defendant Dahya also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Dahya is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Dahya failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Dahya faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

110. Additionally, in connection with his role as a Company director, Defendant Dahya receives substantial income. Accordingly, Defendant Dahya cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

111. In addition, Defendant Dahya signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

112.    Defendant Dahya is neither independent nor disinterested. Any demand upon Defendant Dahya is futile and, thus, excused.

**Defendant Dunn**

113.    Defendant Dunn has served as a Company director at all relevant times hereto. As a director, Defendant Dunn was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Dunn failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

114.    As a trusted Company director, Defendant Dunn conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

115.    Defendant Dunn also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Dunn is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Dunn failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them.

37

Therefore, Defendant Dunn faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

116.    Additionally, in connection with her role as a Company director, Defendant Dunn receives substantial income. Accordingly, Defendant Dunn cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

117.    In addition, Defendant Dunn signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

118.    Defendant Dunn is neither independent nor disinterested. Any demand upon Defendant Dunn is futile and, thus, excused.

**Defendant Lux**

119.    Defendant Lux has served as a Company director at all relevant times hereto. As a director, Defendant Lux was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Lux failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

120.    As a trusted Company director, Defendant Lux conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

38

121.    Defendant Lux also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Lux is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Lux failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Lux faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

122.    Additionally, in connection with his role as a Company director, Defendant Lux receives substantial income. Accordingly, Defendant Lux cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

123.    In addition, Defendant Lux signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

124.    Defendant Lux is neither independent nor disinterested. Any demand upon Defendant Lux is futile and, thus, excused.

**Defendant Rosano**

125.    Defendant Rosano has served as a Company director at all relevant times hereto. As a director, Defendant Rosano was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was

operated in a diligent, honest, and prudent manner.  Despite this, Defendant Rosano failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

126.     As a trusted Company director, Defendant Rosano conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

127.     Additionally, in connection with his role as a Company director, Defendant Rosano receives substantial income. Accordingly, Defendant Rosano cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

128.     In addition, Defendant Rosano signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor

129.     Defendant Rosano is neither independent nor disinterested. Any demand upon Defendant Rosano is futile and, thus, excused.

**Defendant Rosenfeld**

130.     Defendant Rosenfeld has served as a Company director at all relevant times hereto. As a director, Defendant Rosenfeld was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant

Rosenfeld failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

131.   As a trusted Company director, Defendant Rosenfeld conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

132.   Additionally, in connection with his role as a Company director, Defendant Rosenfeld receives substantial income. Accordingly, Defendant Rosenfeld cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

133.   In addition, Defendant Rosenfeld signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

134.   Defendant Rosenfeld is neither independent nor disinterested. Any demand upon Defendant Rosenfeld is futile and, thus, excused.

**Defendant Savarese**

135.   Defendant Savarese has served as a Company director at all relevant times hereto. As a director, Defendant Savarese was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant

Savarese failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

136.    As a trusted Company director, Defendant Savarese conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

137.    Defendant Savarese also serves as Chair of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Savarese is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Savarese failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Savarese faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

138.    Additionally, in connection with his role as a Company director, Defendant Savarese receives substantial income. Accordingly, Defendant Savarese cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

139.    In addition, Defendant Savarese signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

140.    Defendant Savarese is neither independent nor disinterested. Any demand upon Defendant Savarese is futile and, thus, excused.

**Defendant Schoels**

141.    Defendant Schoels has served as a Company director at all relevant times hereto. As a director, Defendant Schoels was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Schoels failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

142.    As a trusted Company director, Defendant Schoels conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

143.    Additionally, in connection with his role as a Company director, Defendant Schoels receives substantial income. Accordingly, Defendant Schoels cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

144.    In addition, Defendant Schoels signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor

145.    Defendant Schoels is neither independent nor disinterested. Any demand upon Defendant Schoels is futile and, thus, excused.

**Defendant Treadwell**

146.     Defendant Treadwell has served as a Company director at all relevant times hereto. As a director, Defendant Treadwell was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Treadwell failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

147.     As a trusted Company director, Defendant Treadwell conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

148.     Defendant Treadwell also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Treadwell is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Treadwell failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Treadwell faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

149.    Additionally, in connection with his role as a Company director, Defendant Treadwell receives substantial income. Accordingly, Defendant Treadwell cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

150.    In addition, Defendant Treadwell signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

151.    Defendant Treadwell is neither independent nor disinterested. Any demand upon Defendant Treadwell is futile and, thus, excused.

**Defendant Wann**

152.    According to the Company's 2023 Proxy Statement, Defendant Wann is not an independent director. As such, demand is futile as to him for that reason and for the reasons that follow.

153.    Defendant Wann has served as a Company director at all relevant times hereto. As a director, Defendant Wann was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Wann failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

154.    As a trusted Company director, Defendant Wann conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

155.    Additionally, in connection with his role as a Company director, Defendant Wann receives substantial income. Accordingly, Defendant Wann cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

156.    In addition, Defendant Wann signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

157.    Defendant Wann is neither independent nor disinterested. Any demand upon Defendant Wann is futile and, thus, excused.

**Defendant Whip**

158.    Defendant Whip has served as a Company director at all relevant times hereto. As a director, Defendant Whip was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Whip failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

159.    As a trusted Company director, Defendant Whip conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

160.    Defendant Whip also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Whip is required to oversee, *inter alia*: (1) the integrity of the Company's financial statements; (2) the Company's compliance with applicable legal and regulatory requirements; and (3) the system of internal controls relating to financial reporting, accounting, legal compliance, and ethics established by management and the Boards from time to time. Despite this, Defendant Whip failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Whip faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

161.    Additionally, in connection with her role as a Company director, Defendant Whip receives substantial income. Accordingly, Defendant Whip cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

162.    In addition, Defendant Whip signed and thus personally made the false and misleading statements in the 2022 10-K and faces a substantial likelihood of liability therefor.

163.    Defendant Whip is neither independent nor disinterested. Any demand upon Defendant Whip is futile and, thus, excused.

**Additional Reasons Demand is Futile**

164.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

165.    The Company, at all material times, had its Code of Conduct, Business Code, and related corporate governance policies which required each of the Individual Defendants to

maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

166.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

167.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

168.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

169.   Publicly traded companies, such as NYCB, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

170.   Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## COUNT I

### (Against the Individual Defendants for Breach of Fiduciary Duties)

171.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

172.   The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

49

173.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

174.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by making or permitted false and misleading statements and/or failing to disclose that: (i) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (ii) that, as a result, NYCB was reasonably likely to incur higher loan losses; (iii) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (iv) that the Company's financial results would be adversely affected; (v) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (vi) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

175.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

176.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### (Against the Individual Defendants for Gross Mismanagement)

177.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

178.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

179.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

180.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

### (Against the Individual Defendants for Waste of Corporate Assets)

181.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

182.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

183.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and

(iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

184.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT IV

### (Against the Individual Defendants for Unjust Enrichment)

185.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

187.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

188.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT V

### (Against the Director Defendants for Aiding and Abetting)

189.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.   The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Individual Defendants.

191.   Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law as alleged herein, and failing to report the same.

192.   As a result, the Director Defendants substantially assisted the Individual Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

193.   As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

194.   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT VI

### (Against the Officer Defendants for Contribution Under Sections 10(b) and 21D of the Securities Exchange Act of 1934)

195.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.   NYCB, along with the Officer Defendants, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

197.    The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing NYCB securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

198.    If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

199.    The Officer Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

200.    Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

201.    As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.      Awarding, against the Director Defendants and in favor of the Company, damages sustained by the Company as a result of the Director Defendants' aiding and abetting of the Individual Defendants' breaches of fiduciary duty;

D.      Awarding, against the Officer Defendants and in favor of the Company, all contribution and indemnification under Sections 10(b) and 21D of the Securities Exchange Act of 1934;

E.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  February 26, 2024

GAINEY McKENNA & EGLESTON

By: */s/ Gregory M. Egleston*
    Gregory M. Egleston
Thomas J. McKenna
Christopher M. Brain
501 Fifth Avenue, 19th Fl.
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com
Email: cbrain@gme-law.com

*Attorneys for Plaintiff*

### VERIFICATION

I, SELWYN KARP, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this ___16___ day of February 2024

SELWYN KARP